IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

ARMANDO DANIEL CALDERON,

    Defendant.

/

No. CR 18-00290-7 WHA

**ORDER RE MOTION TO SUPPRESS**

## INTRODUCTION

In this prosecution for drug distribution and possession of a firearm, defendant moves to suppress the fruits of a warrantless search of his vehicle following a traffic stop. For the reasons stated below, defendant's motion is **DENIED**.

## FINDINGS OF FACT

At 4:00 a.m. on August 20, 2018, Corporal Christopher Zonsius of the San Jose State University Police Department pulled over defendant Armando Daniel Calderon's truck for traffic violations. The truck came to a stop in the driveway of a private apartment building leading down into an underground parking garage. Corporal Zonsius got out of his car, approached the driver's side window of defendant's truck and collected defendant's driver's license and registration. In response to a wants and warrant check, Corporal Zonsius learned that defendant had outstanding warrants for his arrest and was subject to a domestic violence restraining order. After SJSU PD Officers Edward Carboni and Tim Krapivkin responded to

the scene as back-up, the three officers removed defendant from the truck and arrested him. Defendant told the officers that his cousin, Cesar Sanchez, was on his way to take possession of the truck. Corporal Zonsius responded that it would be "fine" for Cesar to take the truck (Gov't Exh. 1 at 00:00–06:40; Gov't Exh. 2 at 00:00–02:00; Gov't Exhs. 7–8).

At 4:06 a.m., Corporal Zonsius and Officer Krapivkin walked defendant up the driveway to the front of Corporal Zonsius's police car. At that same time, Officer Carboni began to search the interior of defendant's truck. He rummaged around through the center consol, moved some papers around, and opened defendant's wallet before pulling a black backpack from behind the center consol in the back seat (Gov't Exh. 1 at 06:40–06:45; Gov't Exh. 2 at 02:00–03:10).

At 4:07 a.m., Cesar arrived on scene. Corporal Zonsius was about to start his search of defendant incident to his arrest, but paused to explain to Cesar that defendant was under arrest pursuant to outstanding warrants. He told Cesar, "[Y]ou can take possession of the vehicle, he has given you permission to do that." At that moment, Cesar noticed Officer Carboni rummaging through defendant's truck. He asked, "Why are you going through his truck?" Officer Carboni responded, "Because he's under arrest, okay? If you would like to take possession of the truck, you can wait over by the tree, okay? But what you're not going to do is just come in here and start asking questions, okay? So after we are done with the truck you can take possession of it, okay?" Officer Carboni returned to searching the truck and Corporal Zonsius began his search of defendant (Gov't Exh. 1 at 06:45–08:30; Gov't Exh. 2 at 03:10–03:35).

At 4:08 a.m., Officer Carboni found 1.5 pounds of methamphetamine in the black backpack he had pulled from behind the center consol of defendant's truck. Officer Carboni walked up to where Corporal Zonsius was searching defendant and said, "You're going to have some on view charges as well." Officer Carboni told defendant that "the truck is no longer going with your brother," and told Cesar that he could go back inside. He went back to defendant's truck and continued to search (Gov't Exh. 1 at 08:30–09:10; Gov't Exh. 2 at 03:35–05:30).

At 4:09 a.m., Corporal Zonsius found six bullets in defendant's pocket. He placed defendant in the back of his police car before returning to defendant's truck. There, Officer Carboni showed Corporal Zonsius the methamphetamine he had found. Corporal Zonsius walked back to his police vehicle to check his computer, returned to defendant's truck and said, "There's going to be a gun in here too, I found bullets." As Corporal Zonsius and Officer Carboni continued to search the truck they had the following exchange:

| | | |
|---|---|---|
| Corporal Zonsius: | | Ok. Ok, we're towing the car because we're placing him under arrest at this time for the felony. |
| Officer Carboni: | | Right. |
| Corporal Zonsius: | | Ok. So, we're doing the inventory search. Let's just double check everything — |
| Officer Carboni: | | Well, in addition to having the felony warrant that's why I'm searching where he has access to — |
| Corporal Zonsius: | | — Ok — |
| Officer Carboni: | | Which is what led me to this [indicating with his flashlight to the methamphetamine in the backpack], which was sitting on the top. |

(Gov't Exh. 1 at 09:10–12:10; Gov't Exh. 2 at 05:30–07:30).

At 4:12 a.m., Officer Carboni found a firearm on the driver's side of the truck nearly at the same time that Corporal Zonsius found an extra magazine in a bag sitting on the front passenger's seat. A few minutes later, Officer Carboni found a second bag containing additional methamphetamine (Gov't Exh. 1 at 12:10–13:30; Gov't Exh. 2 at 07:30–12:30).

At 4:19 a.m., at Sergeant Jennifer Gaxiola's direction, Corporal Zonsius and Officer Carboni took defendant and the evidence they had seized to the police station. Sergeant Gaxiola and Officer Krapivkin stayed on scene to process defendant's truck. An inventory search of the vehicle did not turn up additional narcotics or firearms (Gov't Exh. 1 at 13:30–23:10; Gov't Exh. 2 at 12:30–13:44; Gov't Exh. 6).

During a debrief the following day, Lieutenant Greg Albin criticized the officers for their handling of the search. Lieutenant Albin explained that Officer Carboni "shouldn't have been in the car whatsoever at the time" and that "it was a bad search" (Tr. at 69:19–70:17).

In October 2018, the government filed a first superseding indictment charging defendant with conspiracy to distribute and possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 846, possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and carrying and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Dkt. No. 30).

In January 2019, defendant filed the instant motion to suppress the evidence seized during the August 20 traffic stop. At oral argument in March 2019, the undersigned set an evidentiary hearing. After a two-day evidentiary hearing at which the four SJSU PD officers and a defense expert regarding police practices testified, the parties filed supplemental briefing. This order accordingly follows oral argument, an evidentiary hearing, and full briefing (Dkt. Nos. 78, 110, 124, 127, 133–34, 137–38).[1]

**ANALYSIS**

All agree on the validity of the August 20 traffic stop, defendant's subsequent arrest on outstanding warrants, and Corporal Zonsius's search of defendant incident to arrest. The government concedes, moreover, the *illegality* of Officer Carboni's initial search of defendant's vehicle. The sole issue in dispute is the appropriate remedy for Officer Carboni's clear violation of the Fourth Amendment. The government argues that exclusion of the evidence obtained from defendant's truck would be improper because the officers would have inevitably

---

[1] At the evidentiary hearing in this matter, the Court denied the government's motion to exclude the testimony of defendant's expert witness regarding police practices.

4

discovered the contraband once Corporal Zonsius lawfully found the bullets in defendant's pocket. This order agrees.[2]

As a disincentive to police overreaching in violation of the Fourth Amendment's bar on "unreasonable searches and seizures," the exclusionary rule prohibits the introduction of evidence seized during unlawful searches. *Mapp v. Ohio*, 367 U.S. 643 (1961). The inevitable discovery exception prevents the suppression of illegally obtained evidence if certain conditions are met. Recognizing that the exclusionary rule is meant to "put[] the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred," *Nix v. Williams*, 467 U.S. 431, 443 (1984), the inevitable discovery exception "allows for the admission of evidence that would have been discovered even without the unconstitutional source," *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). In other words, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Nix*, 467 U.S. at 444. "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id*. at 444 n.5. Here, the government has readily met this evidentiary burden.

*First*, the government has proven by a preponderance of the evidence that Corporal Zonsius would have inevitably discovered the bullets in defendant's pocket *prior to* releasing the truck to defendant's cousin. The witnesses consistently testified that conducting a search incident to arrest is a routine procedure. Corporal Zonsius credibly testified that he had made numerous felony arrests of drivers during traffic stops and that where, as here, no other occupants are in the car, he had a practice of removing the driver from the vehicle, placing them into handcuffs, and walking them back to his patrol car to conduct a search incident to arrest. He also credibly testified that he would only deal with the arrestee's vehicle once the arrestee had been placed into his patrol car. This testimony is consistent with Corporal Zonsius's actions during the traffic stop, during which he told defendant that he was "going to deal with

---

[2] Because this order concludes that the inevitable discovery exception applies, it does not reach the government's arguments regarding the attenuation exception.

5

this for a second," referring to the search incident to arrest, before "get[ting] to that," referring to Ceasar taking possession of defendant's property (Gov't Exh. 1 at 8:00–35; Tr. at 9:6–10:18, 73:17–22, 217:2–4).[3]

*Second*, the government has proven by a preponderance of the evidence that Corporal Zonsius would have inevitably searched defendant's truck for a firearm upon finding the bullets in defendant's pocket. Corporal Zonsius credibly testified that once he found the bullets in defendant's pocket, he believed he had probable cause to search the vehicle based on various firearms offenses and that there was no question he would have done so even without Officer Carboni telling him there were "on view charges." He could think of no scenario where he would find bullets on a person he was arresting and not search the vehicle (Tr. at 41:5–11, 54:25–55:6). The fact that Corporal Zonsius was looking for a gun when he returned to defendant's truck is confirmed by the body cam footage, in which Corporal Zonsius states, "There's going to be a gun in here too, I found bullets" (Gov't Exh. 1 at 11:10–25). Defendant's expert witness agreed that "on the facts as we know them" he could not "think of a scenario where [Corporal Zonsius] would not have searched that car once he found the bullets" (Tr. at 206:9–12). As such, this order finds that a probable cause search of defendant's truck for a weapon would have lawfully and inevitably occurred pursuant to routine procedures.[4]

Defendant correctly argues that, even with probable cause, Corporal Zonsius had the discretion whether or not to search the vehicle. And, as defendant also correctly points out, evidence that a search "would have been supported by probable cause and, therefore, could legally have taken place, only makes the inevitable discovery doctrine *potentially* applicable." *United States v. Heath*, 455 F.3d 52, 58 (2d Cir. 2006) (emphasis added). But the government

---

[3] During the evidentiary hearing Corporal Zonsius testified that he did not see Officer Carboni's illegal search of the vehicle because he was focused on searching defendant. The undersigned told Corporal Zonsius "that the officer in your position is supposed to be aware of everything that is going on. And to me, that doesn't add up. I can see it just as plain as day on that video, and you would have been aware of that normally in my opinion" (Tr. at 37:4–16). Evaluating Corporal Zonsius's testimony as a whole, however, the Court finds his testimony to have been credible.

[4] During the defense expert's testimony, the undersigned ruled that the expert was not qualified to answer questions regarding differences in police practices as between university police officers and municipal police officers. Contrary to defendant's argument, this ruling did not render irrelevant any and all of the expert's testimony regarding *general* police practices.

has shown more than that. Not only does the evidence deduced at the evidentiary hearing establish that probable cause existed to search defendant's vehicle for a firearm, the evidence further establishes to a high degree of certainty that Corporal Zonsius *would have* acted on that probable cause and *would have* searched the vehicle for a weapon even absent Officer Carboni's constitutional violation.

Citing *Nix*, 467 U.S. at 444 n.5, defendant next argues that Corporal Zonsius's testimony as to what he would have done that night absent Officer Carboni's illegal conduct is "speculative" and fails to amount to "demonstrated historical facts capable of ready verification or impeachment." This order disagrees. District courts may credit an officer's testimony as to how the officer would have exercised his discretion in a given situation. *See United States v. Peterson*, 902 F.3d 1016, 1020 (9th Cir. 2018) (noting that the district court "credited the arresting officer's testimony that he 'absolutely' would have booked" the defendant on charges that would have led to an inventory search of the defendant's backpack). Despite a vigorous cross-examination, nothing in the record undercuts Corporal Zonsius's testimony that he would have searched the truck upon finding the bullets. Moreover, this testimony does not exist in an evidentiary vacuum. Rather, as set forth above, this testimony is supported by Corporal Zonsius's actions the night of the search (as captured on video) and the defense expert's testimony on general police practices.

Indeed, nothing in the record indicates that Corporal Zonsius would *not* have acted on the probable cause to search the truck for a firearm. Contrary to defendant's assertion that Corporal Zonsius "testified that he does not always act on probable cause" (Dkt. No. 134 at 6), Corporal Zonsius merely testified that he does not "always" exercise his discretion to pull over persons he sees "driving in the bike lane" because he "[m]ight have another call for service; might have other pending calls or there might be other violations" (Tr. at 57:5–12). That does nothing to undercut his testimony that he would have searched the car under the circumstances at issue — probable cause to believe that the subject of a temporary restraining order has a firearm hidden in his vehicle.

7

Finally, defendant argues that whatever routine procedures may have existed at the time of the search, Corporal Zonsius's conduct that night demonstrates that he was not following them. To be sure, the record indicates that Corporal Zonsius made certain missteps during the course of the traffic stop, such as his failure to notice Officer Carboni's initiation of the illegal search and forgetting to turn off his police vehicle's radio before securing defendant in the back seat. But nothing indicates that he would not have followed the routine procedures at issue here, namely, completing the search of defendant incident to arrest before releasing the truck to defendant's cousin and searching the truck upon gaining probable cause to believe that defendant illegally possessed a firearm.

In sum, the search of defendant's truck would have inevitably occurred as a matter of routine procedure. As surely as night follows day, once Corporal Zonsius found the bullets in defendant's pocket, he was going to search the truck for a firearm prior to releasing the truck to Cesar. Because the contraband in defendant's car would have inevitably been uncovered though permissible means, the motion to suppress is **DENIED**.

## CONCLUSION

For the reasons stated, defendant's motion to suppress is **DENIED**. This case will proceed pursuant to scheduling order already in effect.

**IT IS SO ORDERED.**

Dated: May 16, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

8